[Civ. No. 25089.   Second Dist., Div. Four.   Feb. 21, 1962.]

THE PEOPLE ex rel. THE STATE LANDS COMMISSION et al., Plaintiff and Appellant, v. CITY OF LONG BEACH, Defendant and Respondent.

Stanley Mosk, Attorney General, and Howard S. Goldin, Assistant Attorney General, for Plaintiff and Appellant.

Gerald Desmond, City Attorney, O'Melveny & Myers and Pierce Works for Defendant and Respondent.

BALTHIS, J.—This is an appeal by the People of the State of California from a judgment rendered in a declaratory relief and quiet title action in favor of the City of Long Beach. The principal questions to be determined on appeal are (1) whether a condition subsequent (with right of reentry) contained in a quitclaim deed covering certain tidelands executed by the City of Long Beach in favor of the State of California is valid and enforceable, and (2) whether such condition subsequent would be violated by the state leasing out, or offering to lease out, the tidelands for the extraction of oil and gas, with a resultant reverter to the city.

The essential facts, which are not in dispute may be summarized as follows:

In 1925, by legislative grant, the State of California granted certain tidelands and submerged lands (which include the tidelands involved in this litigation) to the City of Long Beach (Stats. 1925, ch. 102). The grant was made subject to certain statutory trusts which are set forth in the footnote.[1]

---

[1] The statute specified that the property is to be held by the city in trust for the uses and purposes and upon express conditions as follows:

(a) That none of said lands shall be used or devoted to any purposes other than public park, parkway, highway, playground, the establishment, improvement and conduct of a harbor and the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures, and appliances necessary or convenient for the promotion and accommodation of commerce and navigation; and said city, or its successors, shall not, at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purpose whatsoever; *provided, however*, that nothing herein contained shall be so construed as to prevent the granting or use of easements, franchises or leases for limited periods, or rights of way in, under,

By a quitclaim deed dated October 15, 1932, the City of Long Beach transferred all of its right, title and interest in and to the tidelands described therein (and which are involved in this action) to the State of California, subject to a certain express condition. The material portions of the quitclaim deed are set forth in the footnote.[2]

Subsequently, the quitclaimed lands were included within Alamitos Beach State Park. A number of operating agreements have been made between the State of California, by and through the State Park Commission and the City of Long

over or across said tidelands or submerged lands for power, telephone, telegraph or cable lines or landings, sewage disposal conduits, wharves and other public uses and purposes consistent with the trusts upon which said lands are held.

(b) That said lands devoted to the conduct of a harbor shall be improved by said city without expense to the state and such harbor shall always remain a public harbor for all purposes of commerce and navigation, and the State of California shall have, at all times, the right to use, without charge, all wharves, docks, piers, slips, quays and other improvements constructed on said lands, or any part thereof, for any vessel or other water craft, or railroad, owned or operated by the State of California.

(c) That in the management, conduct or operation of said harbor, or of any of the utilities, structures or appliances mentioned in paragraph (a), no discrimination in rates, tolls or charges, or in facilities for any use or service in connection therewith shall ever be made, authorized or permitted by said city or by its successors.

(d) The absolute right to fish in the waters of the Pacific ocean over said tidelands and submerged lands, with the right of convenient access to said waters over said lands for said purpose is hereby expressly reserved to the people of the State of California.

[2]The quitclaim deed reads in part as follows:

"QUITCLAIM DEED

"The CITY OF LONG BEACH, a municipal corporation, organized and existing under and by virtue of the laws of the State of California and located in the County of Los Angeles therein, in consideration of the sum of Ten Dollars ($10.00) to it paid, receipt of which is hereby acknowledged, hereby remises, releases and forever quitclaims to the STATE OF CALIFORNIA, for a park, playground, recreational center and/or beach used for recreational purposes, all of its right, title and interest in and to all tidelands and submerged lands, whether filled or unfilled, included within the following described parcels of land situated in the County of Los Angeles, State of California, to wit:

"  .  .  .  .  .  .  .  .  .  .  .

"This conveyance is made upon the express condition that the property conveyed hereby shall be used for a park, playground, recreational center and/or beach used for recreational purposes, and for no other purposes whatsoever, and should said property or any portion thereof be used for any other purpose, then, in that event, the property hereby conveyed shall immediately revert unto the grantor herein, its successors or assigns.

"EXECUTED with all the formalities required by law on this 15th day of October, 1932."

Beach; since April 1, 1934, the city, through its department of recreation and parks, has cared for the beaches constituting a part of the subject lands using the same personnel which maintains municipal beaches within its municipal boundaries. During the period since the execution of the quitclaim the State of California has not erected any improvements upon the property.

By written stipulation the parties to the litigation agreed:

(1) The geological formation underlying a certain parcel (designated as Parcel 5 in the quitclaim deed) is favorable to the deposition and accumulation of oil, gas and other hydrocarbon substances;

(2) It is probable and reasonable to expect that oil, gas and other hydrocarbon substances, exist under and beneath said Parcel 5 in commercially recoverable quantities and that said minerals are, and particularly the mineral oil is, of such quantity, quality and accessibility as to make recovery thereof feasible and commercially profitable;

(3) It is probable and reasonable to expect that migration of oil or drainage is taking place from beneath Parcel 5 toward now producing wells bottomed within the area included in a state oil and gas lease covering certain adjoining tidelands to the southeast in Orange County;

(4) Any recovery of oil and gas from beneath Parcel 5 from drilling operations elsewhere, without actual penetration of the oil and gas pools underlying said Parcel 5, probably would result in loss by waste of reservoir energy in said Parcel 5, and probably would substantially reduce the maximum possible future recovery of oil and gas from beneath said Parcel 5;

(5) It is feasible from an engineering standpoint and it is economically practical to recover oil, gas and other hydrocarbons from beneath Parcel 5 by offshore drilling operations conducted at least one mile from the shore and providing for slant drilling into the subsurface of said Parcel 5 from either the state-owned adjoining tide and submerged lands or from directly over Parcel 5;

(6) It is engineeringly practical to develop Parcel 5 for oil and gas production by drilling from offshore structures located on or outside Parcel 5, without impairment of the use of the beach or existent recreational facilities;

(7) It is probable and reasonable to expect that oil development of Parcel 5 would result in migration of oil or drainage

from beneath tide and submerged lands adjoining Parcel 5 on the west toward said Parcel 5, in the absence of offset drilling measures being taken on said adjoining lands; the adjoining lands are tidelands to the west of Parcel 5, held by the City of Long Beach in trust, pursuant to Statutes 1925, chapter 102, not covered by the quitclaim.

The trial court determined that the State of California was and now is the owner in fee of the quitclaimed tide and submerged lands plus the oil, gas and other hydrocarbons therein contained, as well as the possessor of the exclusive right to drill for and recover such minerals; further, the restriction as to use (condition subsequent) in the quitclaim deed and the right of reentry in the City of Long Beach, are valid and enforceable and should the quitclaimed lands, or any portion thereof be used by the state for any purpose whatsoever other than for a park, playground, recreational center and/or beach used for recreational purposes, said lands would immediately revert to the City of Long Beach.

The state appeals from the judgment and the attorney general states his belief that the basic issue to be determined is: Will oil and gas development of the subject quitclaimed lands, by or pursuant to authority of the state, cause their reversion to the City of Long Beach? The state contends the question should be answered in the negative.

By reason of historical litigation between the state and the City of Long Beach involving various rights in the tideland properties (or income therefrom) within the city limits of the city, several legal points have become well established.

██ The legislative grant by the state in 1925 (Stats. 1925, ch. 102) and the previous grant in 1911 (Stats. 1911, p. 1304), conveyed the fee simple title to the tidelands to the City of Long Beach subject to the trusts specified in the statute. (*City of Long Beach* v. *Marshall,* 11 Cal.2d 609, 614-616 [82 P.2d 362]; *Mallon* v. *City of Long Beach,* 44 Cal.2d 199, 205 [282 P.2d 481].) The title to the lands granted included the oil and minerals therein, which are also subject to the trust. (*City of Long Beach* v. *Morse,* 31 Cal.2d 254, 257-258 [188 P.2d 17]; *City of Long Beach* v. *Marshall, supra,* p. 614.) In addition and prior to the statutory trusts imposed upon the grantee city at the time of the legislative grants, the state itself held the tidelands subject to public or common-law trusts. ██ "It is established law that the state became the owner of tidelands in fee simple upon its admission to the

union, holding them subject to the public trust for navigation, commerce and fishing (*Shively* v. *Bowlby*, 152 U.S. 1 [14 S.Ct. 548, 38 L.Ed. 331]; *Borax Consolidated* v. *City of Los Angeles*, 296 U.S. 10 [56 S.Ct. 23, 80 L.Ed. 9]); that it likewise became owner of the minerals therein (*Boone* v. *Kingsbury*, 206 Cal. 148, 170 [273 P. 797]); and it should reasonably follow that it has the power to grant these lands to municipalities, subject to those same trusts. [Citing cases.]'' (*City of Long Beach* v. *Marshall*, 11 Cal.2d 609, 614 [82 P.2d 362].)

As the quitclaim deed from the City of Long Beach to the state transferred all of the right, title and interest of the city, it follows that after the quitclaim deed the state owned the fee simple title to the tidelands described therein, including the oil and minerals in such lands. This fact (or conclusion) was correctly determined by the trial court and apparently is conceded by both parties to the litigation.

The questions presented concern the determination of the further and more detailed rights and interests of the parties in the tidelands involved here following the execution, delivery and acceptance of the quitclaim deed in 1932. A discussion of such rights and interests follows.

(1) The specific statutory trusts set forth in the legislative grant (Stats. 1925, ch. 102) were discharged and terminated after the delivery of the quitclaim deed. The state, as settlor-beneficiary, created these statutory trusts, and having received a reconveyance of the fee simple title from the trustee city, the trusts were discharged. In other words, there was a merger or union of the legal and equitable title concerning such statutory trusts upon the conveyance back to the state and no further continuance of the statutory trusts was needed or useful. The basic rule of trusts is stated in the Restatement Second of Trusts (1957) section 99(5) as follows: ''The sole beneficiary of a trust cannot be the sole trustee of the trust.''

As to merger, section 341(1) of the Restatement, *supra,* provides in part: ''. . . if the legal title to the trust property and the entire beneficial interest become united in one person who is not under an incapacity, the trust terminates.'' See also the statement of the rule, ''It is also held generally that where the legal and equitable title of real estate both vest in the same person, the equitable title will merge in the legal estate, and absolute ownership will ensue divested

of the trust." (*Langley* v. *Conlan,* 212 Mass. 135, 138 [98 N.E. 1064, 1066, Ann.Cas. 1913C 421].)

█ (2) Upon the reacquisition of the tidelands from the city by virtue of the quitclaim, the state undoubtedly held such property subject to the public or common law trusts for navigation, commerce and fishing; these are the trusts that were established and effective when the state was admitted to the union. (*City of Long Beach* v. *Marshall,* 11 Cal.2d 609, 614 [82 P.2d 362].) █ The state, as owner of the tidelands, subject to such *public* trusts, was and is the owner of the oil and mineral rights, and without here considering the effect of the condition subsequent which is discussed later, the state may drill for and extract oil from such tidelands as long as such use and development does not impair or interfere with the *Public* trusts above mentioned (*Boone* v. *Kingsbury,* 206 Cal. 148, 183 [273 P. 797]; *City of Long Beach* v. *Marshall,* 11 Cal.2d 609, 620 [82 P.2d 362]).

█ (3) We now come to the important question as to the effect of the express condition set forth in the quitclaim deed reading: "This conveyance is made upon the express condition that the property conveyed hereby shall be used for a park, playground, recreational center and/or beach used for recreational purposes, and for no other purposes whatsoever, and should said property or any portion thereof be used for any other purpose, then, in that event, the property hereby conveyed shall immediately revert unto the grantor herein, its successors or assigns."

According to well-established law, this language created not an *estate* or *reversionary interest,* but only a power or right which might be exercised upon breach of the condition. In *Parry* v. *Berkeley etc. Foundation,* 10 Cal.2d 422 [74 P.2d 738, 114 A.L.R. 562], the deed given contained various restrictive provisions in the form of conditions subsequent with right of reentry, including one prohibiting the use of the property for the purpose of selling intoxicating liquors. In discussing the legal effect of this condition, the court said, at pages 425-426: "A more accurate analysis of the interest involved discloses that when the grantor conveys the fee simple on condition subsequent, he has no actual *estate* remaining with him. The grantee takes the entire estate of the grantor, and unless he breaches the conditions is in the same position as an owner in fee simple absolute. The interest of the grantor in such case is not, strictly speaking, a residue of the estate

left in him; it is merely a right or power to terminate the estate of the grantee and retake the same, if there is a breach of condition."

The Attorney General argues that as the statutory trusts were terminated, the condition subsequent in the quitclaim is void because it attempts to limit the use of the tidelands solely to recreational use and this would unlawfully narrow and restrict the public and common law trusts of navigation, commerce and fishing. Such a rigid construction of the condition is not necessary or required. ▪▪▪▪ A more reasonable interpretation of the language used in the quitclaim is that the tideland properties shall be used "for a park, playground, recreational center and/or beach used for recreational purposes" insofar and to the extent that such uses do not impair or interfere with the public trust purposes of "navigation, commerce and fishing." In other words, the lands being subject to such public trusts, the city could not prohibit, narrow, or restrict such public uses by the language used in the quitclaim deed and the conditions are restrictive as to use only insofar as the recreational uses specified do not conflict or interfere with the public trusts.

The attorney general further contends that when the City of Long Beach reconveyed the tidelands to the state, the statutory trusts were terminated and revoked and there was a complete reverter to the state as settlor of the trust and the city did not retain any interest whatsoever. This argument overlooks the fact that the city does not claim any *estate* or *interest* in the corpus (the subject tidelands); the only right claimed is the power of reentry for condition broken. *Parry* v. *Berkeley etc. Foundation*, 10 Cal.2d 422 [74 P.2d 738, 114 A.L.R. 562].) It is clear, therefore, the condition subsequent was effective and continued in existence after the execution and delivery of the quitclaim.

(4) We are presented next with the question as to whether or not the condition subsequent would be violated by the state leasing out the tidelands for oil drilling and extraction. ▪▪▪▪ This calls for an interpretation and construction of the provision in the quitclaim that the tidelands "shall be used for a park, playground, recreational center and/or beach used for recreational purposes, *and for no other purposes whatsoever*" and further that "should said property . . . *be used for any other purpose*" (italics added) then it should revert to the grantor. This language must be given a reason-

able interpretation and such as will give effect to the intention of the parties (Civ. Code, §§ 1636, 1643).

The intent as shown by the words used in the quitclaim indicates that the objective of the city was to protect permanently the use of the tidelands for a beach, park and playground area. We believe that this intent or objective, as stated in the quitclaim deed, is not interfered with or defeated by the proposed drilling for and extraction of oil from such tidelands in the instant case.

In support of this view as to the intent of the parties we need only refer to the early, important and somewhat analogous case of *City of Long Beach* v. *Marshall,* 11 Cal.2d 609 [82 P.2d 362]. In that case it was held that the City of Long Beach, as the owner of the tidelands (there involved) and the mineral and oil rights, could drill for and extract oil without such use being in conflict with either the statutory trusts (which included specified recreational uses) or the public trusts for navigation, commerce and fishing. The legislative grants (Stats. 1925, ch. 102, p. 235) there made by the state provided the tidelands were to be held by the city upon certain express conditions, in part as follows:

"That none of said lands shall be used or devoted to any purposes other than public park, parkway, highway, playground, the establishment, improvement and conduct of a harbor and the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation. . . ."

The City of Long Beach there contended (and was upheld in such contention) that having the fee simple title to the tidelands and being the owner of the oil and mineral rights, it could drill for and extract oil because such use did not violate the intent of the legislative grant and did not interfere with the express conditions specified in such grant and set forth above. The Supreme Court said, "The final question is whether the city has the right to drill for and extract the oil from these lands which it owns. Nothing in the grant purports to reserve to the state or to deny to the municipality the minerals or the right to extract them. . . . It is, of course, true that the operations must not be conducted in such manner as to impede the use of the harbor, but there is nothing before us to suggest that drilling will have any such effect. (See

*Boone* v. *Kingsbury,* 206 Cal. 148, 183 [273 P. 797].)'' (11 Cal.2d 609, 620.)

While the position of the parties is reversed in the case before this court, the state having acquired the property by quitclaim from the city subject to a condition subsequent as to use, we believe the same rule and the same interpretation of intent are applicable and determinative. The defendant city argues the importance of the words used in the quitclaim ''and for no other purposes whatsoever''; however, in the *Marshall* case the legislative grant by the state to the City of Long Beach there construed provided ''that none of said lands shall be used or devoted to any purposes other than'' the particular uses specified. In the analogous situation here, we believe it does not violate the intent of the quitclaim (and the condition subsequent as to use therein contained) to permit the state, as owner of the tidelands, to drill for and extract oil.

It should be noted that in the instant case the conveyance was made to the state by the City of Long Beach. The condition subsequent was imposed by a public body and not a private party. This brings into application the well-settled rule that a less strict construction of a restrictive condition is adopted as to dedications made by the public. The case of *City & County of San Francisco* v. *Linares,* 16 Cal.2d 441 [106 P.2d 369], involved the proposal for a 50-year lease of the subsurface space beneath Union Square Park in San Francisco for the purpose of erecting and constructing therein a public automobile garage and parking stations. The court applied the rule mentioned, saying at page 444: ''It will also be noted that the Town of San Francisco acquired the property, not as the grantee of a private party or individual, but as the result of a dedication by a public authority. The rule of construction is not the same in both instances. In *Slavich* v. *Hamilton,* 201 Cal. 299 [257 P. 60], wherein the question of the right to construct a veterans' memorial hall in a public park was involved, it was said: 'The uses to which park property may be devoted depend, to some extent, upon the manner of its acquisition, that is, whether dedicated by the donor, or purchased or condemned by the municipality. A different construction is placed upon dedications made by individuals from those made by the public. The former are construed strictly according to the terms of the grant, while in the latter cases a less strict construction is adopted. (*Harter* v. *City of San*

*Jose,* 141 Cal. 659 [75 P. 344] ; *Spires* v. *City of Los Angeles,* 150 Cal. 64 [87 P. 1026, 11 Ann.Cas. 465].)' "

The application of the rule to the instant case is made even stronger and more logical when it is remembered that the city itself originally acquired this property by legislative grant and gift made by the state. Therefore, it is not too persuasive for the city to argue a case for strict construction for breach of the condition subsequent.

In discussing the question as to whether or not the proposed drilling for oil would violate the condition subsequent, we rely upon the written stipulations of the parties that (a) "It is feasible from an engineering standpoint and it is economically practical to recover oil and gas . . . from beneath Parcel 5 of the quitclaimed lands by offshore drilling operations conducted at least one mile from the shore and providing for slant drilling into the subsurface of said Parcel 5 from either the State-owned adjoining tide . . . lands . . . or from directly over Parcel 5 . . ." and (b) "It is engineeringly practical to develop Parcel 5 for oil and gas production by drilling from offshore structures located on or outside Parcel 5, without impairment of the use of the beach or existent recreational facilities."

The authorities support the view that the use of the quitclaimed tidelands involved here for the extraction of oil and gas would not constitute a breach of the condition subsequent which would result in a reverter to the city.

In *Boone* v. *Kingsbury,* 206 Cal. 148 [183 P. 797], it was held that a statute permitting the leasing out by the state of the tidelands for oil drilling purposes does not substantially impair the public interests in the tidelands or the public trusts involved. (P. 183.)

In *Taylor* v. *Continental Southern Corp.,* 131 Cal.App.2d 267 [280 P.2d 514], real property was granted to the City of Long Beach by a conveyance which recited in part the condition that the property "be used exclusively for the benefit of the inhabitants of said city, and of all the public as and for a public park for the health and recreation and pleasure of the inhabitants of said town and of the public." (P. 272.) The court construed this conveyance to be a grant of a fee simple on condition subsequent, which left in the grantor a power of termination if the property ceased to be used for a public park. The court in that case said, "The general rule is that a dedication for park purposes passes a fee simple to the

grantee (*Washington Blvd. Beach Co.* v. *City of Los Angeles,* 38 Cal.App.2d 135, 138 [100 P.2d 828]) . . . And a conveyance for park use not only carries all oil and minerals, but also the right to develop same in any manner not inconsistent with use of the surface of the land for park purposes.'' (P. 274.)

The case of *Central Land Co.* v. *City of Grand Rapids,* 302 Mich. 105 [4 N.W.2d 485, 144 A.L.R. 478], is very much in point. In that case plaintiff had conveyed to defendant city certain parcels of real property containing approximately 25 acres for park, street and boulevard purposes. The deed contained the following condition: ''This conveyance is given upon the express condition that the two parcels of land above described shall be used solely for park, highway, street, or boulevard purposes; and if any part thereof be not used for any of such purposes, or at any time cease to be used for such purpose, or at any time be used for any other purpose, said part or parts shall immediately revert to the grantor, its successors or assigns.'' (4 N.W.2d 485, 486.) After the city had entered into a contract with an oil company for the latter to drill for oil on the land involved, the plaintiff filed an action in ejectment on the basis that the city had breached the condition and the property had reverted. The court states the question as follows (4 N.W.2d 485, 486): ''The primary question in this case is whether there was a breach of condition subsequent by the city in giving an oil lease to defendant Rex Oil and Gas Company.'' In holding there was no breach of the condition subsequent, the court said, at page 487 [4 N.W.2d]: ''At first blush it might seem that the maintenance and operation of one or more oil wells on this park property would be in violation of the restricted purposes for which the land was conveyed to the city; but in determining whether there has been such a real and substantial violation of the condition in the deed to the city, consideration should be given to the purpose obviously sought to be accomplished by the condition embodied in the grant . . .

''Defendants have taken rather extraordinary care in so operating the oil wells on the park property that this activity does not materially impair the use of the land for the purposes for which it was conveyed to the city.''

In *City of Shreveport* v. *Kahn,* 194 La. 55 [193 So. 461], certain property was granted to the city for park purposes only. Subsequently the city entered into an oil and gas lease.

The city brought a slander of title action against the defendants who claimed a breach of the restrictive conditions and who asked that the city be enjoined from using the lands for oil production. The court states the terms of the conveyance and the city's position as follows (193 So. 461, 466-467): "The title of the property was conveyed to the City in fee simple for a substantial consideration, the deeds containing a recital that the property was conveyed for park purposes only . . .

". . . the City of Shreveport contends that oil and gas underlying the 80 acres of land comprising Lakeside Park may be extracted and saved for the benefit and advantage of all the inhabitants of the City without substantial interference, and then only temporarily, with the use of the land for park purposes and without changing its destination as such."

The court held there was no breach of the condition contained in the conveyance, saying, "We do not think that the drilling and operating of two oil or gas wells under the obligations imposed and assumed by the lessee could possibly interfere with the free or customary use of Lakeside Park for park purposes . . . the evidence satisfactorily shows that Lakeside Park may be safely developed for its minerals without danger to the public and without substantial interference with the use of the property for park purposes." (193 So. 461, 467-468.) (See also *Keaton* v. *City of Oklahoma City,* 187 Okla. 593 [102 P.2d 938]; *Howe* v. *City of Lowell,* 171 Mass. 575 [51 N.E. 536, 539-542]).

The defendant city relies heavily upon the case of *Los Angeles & Salt Lake R. Co.* v. *United States* (C.C.A. 9 Cir.) 140 F.2d 436. In that case the plaintiff railroad company conveyed certain strips of land to the United States "for the purposes of a free, public, navigable channel" and the two deeds involved further contained a clause reading ". . . provided further that if the use of said strip of land for the said granted purposes shall at any time be discontinued, or the same be abandoned or be used for any purposes other than specified herein, the estate and title hereby conveyed shall, without the necessity of a reconveyance, revert and revest in [grantor], its successors and assigns." (140 F.2d 436, 437.) Years after the deeds were given, oil was discovered in the area and plaintiff [United States] filed a declaratory relief action claiming it had the right to use the land for purposes other than those specified in the deeds, namely for the produc-

tion of oil and gas. The upper court held for the defendant railroad company, saying: "... appellee [United States] has no right to use the 600-foot strip of land above mentioned, or any part of it, for any purpose other than the purposes of a free, public, navigable channel, and hence has no right to use it for the production of oil, gas, hydrocarbon or other mineral substances." (P. 439.)

While undoubtedly the above case does lend considerable support for the city's position here, it is not controlling and we believe the previous decisions of our Supreme Court (*City of Long Beach* v. *Marshall*, 11 Cal.2d 609 [82 P.2d 362]; *City of Long Beach* v. *Morse*, 31 Cal.2d 254 [188 P.2d 17]; *Boone* v. *Kingsbury*, 206 Cal. 148 [273 P. 797]) and other cases cited and discussed above fully support the holding made herein. Further, in passing, it should be pointed out that the *Los Angeles & Salt Lake R. Co.* v. *United States* case, *supra*, may be logically distinguished upon two grounds, (1) the grant in that case was by a private party and not by a public body, as in the instant case, and the rule as to strict construction of the uses permitted is not applicable (*City & County of San Francisco* v. *Linares*, 16 Cal.2d 441, 444 [106 P.2d 369]; *Slavich* v. *Hamilton*, 201 Cal. 299 [257 P. 60]), and (2) the grantee under the quitclaim involved here, the state, was the original owner of the property and the quitclaim was a reconveyance of the state's original title to the tidelands.

A summarization of the status of title as to these tidelands and of the interests of the parties as of the date of the filing of the declaratory relief and quiet title action is as follows: A fee simple title to the tidelands is owned by the state which includes title to the oil and minerals therein; the state holds these tideland properties subject to the public trusts for navigation, commerce and fishing but they are no longer subject to the statutory trusts specified in the legislative grant to the City of Long Beach (Stats. 1925, ch. 102); the City of Long Beach holds not an estate in the subject tidelands but a condition subsequent providing for specified recreational uses (which must be not in conflict with the public trusts above mentioned) with a power of reentry for any substantial breach of the condition subsequent; the condition subsequent would not be breached by the drilling for or extraction of oil and gas by or under the authority of the state, providing that such oil drilling and extraction can be

accomplished without any substantial interference with the public trusts and the recreational uses above mentioned. (*City of Long Beach* v. *Marshall,* 11 Cal.2d 609 [82 P.2d 362] ; *Boone* v. *Kingsbury,* 206 Cal. 148, 183 [273 P. 797].)

As a final point to be considered, the defendant city, as respondent on this appeal, urges in support of the judgment and not to overthrow it, the argument that the State Lands Commission has no jurisdiction over these tidelands because they are committed to the jurisdiction of the State Park Commission, and as a result the State Lands Commission has failed to show any justiciable interest in the subject lands. Defendant argues that the state is not and cannot be aggrieved by the judgment and is not prejudiced if it be affirmed.

The basis of defendant's contention on this point is that although exclusive jurisdiction over ungranted tidelands owned by the state is vested in the State Lands Commission by section 6301 of the Public Resources Code, an exception is provided for in section 6403 of the same code (added by Stats. 1947, ch. 227, p. 796). This last-mentioned section provides that the chapter of which it is a part shall not be construed as applicable to the sale or exchange by the state of lands of six specified classes and among these is the following : '' (f) Land acquired by the State for public use.''

The defendant then concludes its argument with the assertion that the tidelands involved here were acquired by the state for public use; that the State Park Commission is the agency designated to supervise and charged with the acquisition, maintenance and protection of ocean beaches for public recreational purposes; that the State Lands Commission has no jurisdiction over any part of the state park system.

The trial court held that while it was unnecessary to determine the question as to whether or not the State Lands Commission held exclusive jurisdiction, the State Lands Commission did have at least nonexclusive jurisdiction and the authority to maintain the lawsuit. We are in agreement with the trial court on this particular point.

An examination of the pertinent statutes indicate the strong legislative intent to give jurisdiction over the tidelands to the State Lands Commission, particularly where as in this case there is a question to be determined about the leasing of the tidelands for the drilling for the extraction of oil and gas.

Section 6301 of the Public Resources Code indicates

the basic intention to give the State Lands Commission exclusive jurisdiction over all ungranted tidelands.

There were two sections numbered 6403 which were added to the Public Resources Code by the 1947 Legislature. That section 6403 which is mentioned in Public Resources Code section 6301 was added by Statutes 1947, chapter 227, section 3, page 796, and enumerates those sales or exchanges of land by the state to which chapter 5, division 6, part 1 of the Public Resources Code is not applicable. The other section 6403 of the Public Resources Code was added by Statutes 1947, chapter 887, section 6, page 2084, and contains the following specific statement of legislative intent:

"This section is enacted for the purpose of declaring the scope and extent of the powers, duties, purposes, responsibilities and jurisdiction of the State Lands Commission and the legislative intent with respect to reservation of mineral deposits reserved to the State (Section 6401); but nothing herein shall be construed as limiting any power, duty, purpose, responsibility or jurisdiction heretofore or by this code vested in or conferred upon the commission."

A separate statute declaring the scope and extent of the powers, duties, purposes, responsibilities and jurisdiction vested in or conferred upon the State Lands Commission is section 6216 of the Public Resources Code, as added by Statutes 1941, chapter 1274, page 3219. This section sets forth a comprehensive statement of the State Lands Commission's jurisdiction and powers over public lands, including tide and submerged lands, owned by the state or under its control.

The specific authority of the State Lands Commission to lease tide and submerged lands is contained in sections 6871 and 6872 of the Public Resources Code.

We further believe that the subject tidelands property is not "land acquired by the state for public use" within the meaning of section 6403 of the Public Resources Code (Stats. 1947, ch. 227, § 3, p. 796). The quitclaimed tidelands were not strictly speaking "acquired" by the state in view of the fact that the tidelands involved were originally acquired and held by the state by virtue of its sovereignty, and a beneficial interest under the statutory trusts was always held even after the legislative grant to the city became effective in 1925. When the trustee (the city) reconveyed to the state (the beneficiary under the statutory trusts) by quitclaim in 1932, it was not "acquisition" in the ordinary sense of that

word. Further, since prior to the quitclaim the state held a beneficial interest for the public, it was not an acquisition ''for public use.''

We hold that jurisdiction over the subject tidelands is with the State Lands Commission and it may properly maintain the action for declaratory relief and to quiet title.

The judgment of the trial court is reversed with directions to enter a judgment in conformity with this opinion.

Burke, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied March 8, 1962, and respondent's petition for a hearing by the Supreme Court was denied April 18, 1962.