[Criminal No. 682.  Filed December 2, 1929.]

[282 Pac. 481.]

EVA DUGAN, Appellant, v. STATE, Respondent.

Mr. Stanley Samuelson and Mr. Otto E. Myrland, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Riney B. Salmon, Assistant Attorney General, and Mr. Claude Smith, County Attorney, for the State.

ROSS, J.—The information charged that defendant, Eva Dugan, on or about January 14, 1927, killed and murdered one A. J. Mathis. From a verdict and judgment of conviction of first degree murder, fixing the penalty at death, and from an order overruling her motion for a new trial, she has appealed.

Her first contention is that the evidence does not support the verdict. The evidence of the *corpus delicti* is all circumstantial, and it is said that there was a possibility that another than defendant had committed the act; that therefore the circumstances do not exclude every reasonable hypothesis except that of guilt. It is not contended the court's instructions on circumstantial evidence were incorrect. Indeed, the instructions in that regard, as in all other respects, were exceptionally clear and free from error. The complaint is that the jury disregarded the instructions.

As disclosed by the transcript of the testimony, the salient facts are as follows:

The deceased, in December, 1926, lived by himself at his ranch or country house on the Oracle road, about four miles north of Tucson. He was around sixty-three years of age, and, according to his physician and neighbors, enjoyed fairly good health. He was not robust, but he was not a sick man, according to the evidence other than that of the defendant. He was hard of hearing and used an ear trumpet. He occupied his time in improving his place, but recently acquired, in raising chickens, and in gardening. He was in Tucson on December 11th, 1926, and there by

accident met defendant, who had just arrived from California and was looking for employment. Deceased then and there engaged defendant as housekeeper, and together in his Dodge coupé they returned to his country home.

On January 13th or 14th, 1927, there appeared at the Mathis ranch a young boy, nineteen or twenty years old, referred to in the testimony of the different witnesses as "the boy," and by defendant as "the kid" and "Jack." This youth was employed in Tucson and sent to the ranch by the defendant, as she testified. She explained she did not know Jack, and had never met him until on the morning of the 13th of January, when he "bummed" her for his breakfast at the Santa Fe restaurant. It is quite definitely settled that this youth was at the Mathis ranch on the 14th, 15th and 16th of January.

His neighbors did not see deceased after Friday, January 14th. On that day he was in Tucson, and visited with several of his friends and acquaintances. He returned home in the afternoon or early evening, and was never again seen alive by his neighbors. Saturday, the 15th, and Sunday, the 16th, defendant told the neighbors that Mathis had gone to California to get some money with which to care for a mortgage on his property, and had authorized her to sell his cow, chickens and Dodge coupé. On Sunday she asked Mr. C. W. Bowyer, who lived close by, to look after things on the Mathis place, stating she was going to drive to Nogales for "just a day," and that Jack was going to drive her; told another neighbor, Mrs. Frances Mitchell, on Saturday, that Mathis had gone that morning by train to Phoenix to get mortgage money, and if he failed there would go on to California, and would be gone about a month; and on Sunday told Mrs. Mitchell she was going to Nogales for a few days, and the boy said something about their going to El Paso. At the

same time defendant offered to sell the Jersey cow for $60, saying Mathis had authorized her to sell it; said, when Mathis returned from California, they intended to marry.

Jack and defendant left the ranch in the Dodge coupé Sunday afternoon, Jack driving. The defendant did not know how to drive. They arrived at Lowell, Arizona, at 1:15 o'clock on Monday morning, put up at the Sander's auto camp. The defendant registered under the name of "B. B. Jones, City," and when asked the number in her party said just herself and her husband (Jack). Some time Monday they left Bisbee or Lowell, and in due time turned up at Amarillo, Texas, where they sold the Dodge coupé for $600, executed a bill of sale thereof in the name of "A. J. Mathis," and were paid therefor by check made to "Eva Mathis," under which name defendant cashed the check. She and Jack traveled together from Amarillo to Kansas City, where they separated, she going to White Plains, New York, and Jack completely fading from the picture.

Defendant was returned to Arizona from New York, tried on the charge of stealing the Dodge coupé, and convicted of grand larceny. On that trial she testified to a story in its general details like the one she told the neighbors just before her flight—that is, she said Mathis had gone to California to raise money to meet some of his legal obligations; that she was authorized by him to dispose of his personal property, including the Dodge coupé; admitted her flight east with the boy Jack, and the sending of a telegram and the writing of letters to elude pursuit. Later, and while defendant was serving a term of imprisonment for stealing the Dodge coupé, on, to wit, December 13th, 1927, one J. F. Nash was in the act of putting up a tent on premises, as we gather, just off the Mathis place, when he discovered signs of a grave. He notified the sheriff of Pima county

and the sheriff and others found upon investigation the skeleton of A. J. Mathis. The grave was very shallow, and was located in a spot where debris and trash had formerly been deposited. This covering had been scattered or had decayed, leaving a depression easily seen at the time it was discovered by Nash. There was a fracture in the skull, showing that Mathis' death was a violent one.

After Mathis' body was found and identified, the murder charge was preferred against defendant. Upon the trial she testified in her own behalf, and, being confronted with absolute proof of Mathis' death, she said Jack did it by accident. She explained that after supper, at about 7:30, on the evening of Friday, January 14th, 1927, Mr. Mathis and Jack went out to catch some chickens for delivery to purchaser the following morning and to milk the cow; that soon thereafter she saw Jack running as though to leave the place; that he got caught in a wire fence; that when she went to him he said Mathis wanted him to milk the cow; that he couldn't, and "the old man popped him upon the side of the head there, and said, 'What in the hell are you good for?' slapped him, and the kid just throwed his arm around there like that carelessly—didn't think it was such a blow—caught him right there (indicating) and he fell backwards. He was weak and sick in the stomach here anyway, and just a blow like that, unexpected to him, would knock him over, knock him down, and he fell. What wind was left with him I guess went out the rest when he fell. It was hard there. There was nothing at all, but just pure hard ground''; that she and Jack tried to resuscitate him, but could not; that they put him in the auto about 11 o'clock that evening, and Jack took him away, while defendant stayed home; that Jack returned about 5 o'clock the morning of the 15th, and they

then agreed to concoct the story of Mathis' going to California, etc.

In addition to these various contradictory stories told by defendant, it was shown to the jury that the Mathis residence had been stripped of practically everything; that the charred and burned remains of the Mathis ear trumpet had been found in the heating stove in the Mathis house soon after defendant's flight. There was also evidence tending to show that defendant, on or about January 9th, 1927, was planning to get possession of the Mathis automobile. On that day she said to one H. B. Osborne that she wanted to go to Amarillo, Texas, and needed someone to drive the car for her. She said, "The old man I am working for has a car I can get any time I want." The defendant, at the time of the disappearance of Mathis, was about forty-nine years of age, and as shown by her own testimony was immoral, profane and intemperate. She had been married five times, the bonds being severed four times by death and once by divorce.

But defendant says another person had an opportunity to kill Mathis; that the record shows that "Jack" could have done it, and that therefore the jury should have entertained a doubt of defendant's guilt from this bare fact. However, the jury was not bound to believe defendant's statement that "Jack" killed Mathis. They had a perfect right to disregard such statement. In view of the fact that no one knew Jack, or who he was; that he was procured by defendant; that she was looking for someone who could drive an automobile; that Mathis' death was due to a fracture of the skull, and not to a careless blow in the solar plexus, the studied deception about Mathis being in California, the false claim of ownership of his personal property, the destruction of his ear trumpet by burning, the flight and maneuvers to hide their movements and identity, the jury

might well have concluded that the hands of both the defendant and Jack were stained with Mathis' blood.

We have so frequently decided that it is the province of the jury to pass on the weight and credibility of the evidence, and that the verdict thereon will not be disturbed, if the evidence is conflicting, that it is not deemed necessary to cite cases for the rule. Under this rule, it was for the jury to say from all the evidence, direct and circumstantial, whether the inculpatory facts shown were or were not compatible with the innocence of defendant, and were or were not incapable of explanation upon any other reasonable hypothesis than that of her guilt.

Assignment No. 2 is that the court erred (1) in permitting the state to introduce, over defendant's objection, the transcript of the testimony of Eva Dugan in the case of *State* v. *Eva Dugan,* in which the defendant was convicted of the larceny of the Dodge coupé; (2) in refusing to strike, on defendant's motion, opinion evidence of the witness John Farrell, deputy sheriff of Pima county, with reference to a piece of cloth declared by witness to have been used as a gag; and (3) in refusing to permit defendant to cross-examine witness Farrell as to his qualifications to identify lime.

We have carefully read the defendant's brief on these assignments, and nowhere therein does she cite us to the page of the transcript of the testimony showing facts to sustain such assignments, except in subdivision (3). We have, however, examined the testimony, and we find that the ruling of the court on the admission of the transcript of defendant's testimony in the larceny case was that such testimony was admissible for the purpose of showing admissions against interest, but extended to the defendant the right to except to any of such testimony as she might see fit, and that such testimony was admitted and read without further objection, or, if parts were ob-

jected to, the court's ruling was had thereon. As to subdivision (2), Farrell, who assisted in taking Mathis' skeleton from the grave, said that there was a cloth tied around the jaws that in his opinion had been used as a gag. Defendant had every opportunity, and exercised it, to cross-examine Farrell on this statement, and the jury, of course, could draw its own conclusions as to whether the opinion was well founded or not. As to subdivision (3), the court did not refuse to defendant the right to cross-examine Farrell as to his qualifications to identify lime, but explicitly told counsel that he might do it later, and it appears that he did later cross-examine such witness.

Assignment No. 3 is directed at what defendant has chosen to designate as an antagonistic attitude on the part of the sheriff of Pima county in testifying for the state. If, as contended, the sheriff showed too much zeal to secure defendant's conviction, it must have been apparent to the jurors, who, as sensible and fair-minded men, would have taken into consideration any animus or prejudice by the sheriff, and weighed his testimony accordingly.

Assignment No. 4 is that one of the jurors, O. K. Bush, had a direct connection with material portions of the evidence upon which the defendant was convicted, which fact was known to the county attorney and the juror, but not disclosed. It seems that the basis of this assignment is that Bush bought from Ham Wachter, the administrator of the Mathis estate, the Dodge coupé which defendant and Jack had driven to Amarillo, Texas. It is not contended that this juror, on his *voir dire* as a juror, did not fully qualify and show himself competent and unprejudiced. The ground here assigned was presented to the lower court on defendant's motion for a new trial. Upon the hearing of the motion, Juror Bush was asked the

following questions and made answer thereto as follows:

"Q. And the fact that there was some testimony given in the case with respect to that car, that didn't affect your verdict in anywise, did it? A. No.

"Q. It didn't have any influence upon your deliberations in the case, did it? A. No. . . .

"The Court: Q. Were you influenced in any way, Mr. Bush, in rendering a verdict of guilty by the fact that that might establish the nonexistence of Mr. Mathis? A. No, sir; the car never interfered with me at all—nothing. I just listened to the case, and I really didn't have my opinion set either way.

"Q. Were you influenced, Mr. Bush, in any way in serving as a juror, or in any action you took as a juror, in finding the defendant guilty, so that it would be judicially established that Mr. Mathis was gone forever? Were you influenced in any way that way? A. No, sir; I just took a chance on what Mr. Wachter said. I just bought this car.

"Q. Relied on Mr. Wachter, entirely? A. Yes, sir.

"Q. You were not a particle, you say, influenced in your deliberations as a juror by the fact that he might turn up and might possibly have some claim to the car? A. No, sir."

The trial court concluded, and we think correctly so, that the juror was competent.

Assignment No. 5 has to do with the custody of the exhibits offered by the state during the preliminary hearing. Some X-ray photographs, instead of being left with the examining magistrate, to be by him forwarded to the clerk of the superior court, were turned over to the sheriff, in whose custody they were left until the trial. There is no evidence that the exhibits had been tampered with, or in any manner changed. What is more, defendant did not object to their admission on that or any other ground.

Assignments 6 and 7 are that the court should have granted defendant's motion for a new trial upon the grounds (a) that the jurors, after retiring to consider

their verdict, separated without leave of the court, and (b) that after the jury retired to deliberate upon the case two of the jurors conversed with persons unknown in regard to and concerning the case. These two assignments are so interrelated that they can be best considered together. At the hearing of the motion for new trial, the court took evidence on these two charges of misconduct of the jury. Juror G. F. Crisp said that after the case was submitted, and before verdict, he telephoned with permission of the court to his place of business not to close until ten o'clock; that there were in the room where he telephoned three or four persons, one being defendant's attorney; that the telephone was just a few feet from the jury-room, and that the door between the two rooms was open at the time; that he was in plain view, and close enough for the other jurors to hear anything he said; that some of the jurors were standing right close to the door between the room in which he was talking and the jury-room. At the same telephone and surroundings Juror O. K. Bush, with permission from the court, telephoned his wife to wait until ten o'clock, and that he would telephone her again. He explained that he lived thirteen miles in the country, and that he told his wife to wait, and he would know at ten o'clock whether she should go out home alone. It is contended by defendant that what was done violated subdivisions (6) and (10) of section 1105 of the Penal Code of 1913. The material part of such section reads as follows:

"1105. When a verdict has been rendered against the defendant the court shall, upon his application, grant a new trial, in the following cases: . . .

"(6) When the jury has separated without leave of court after retiring to deliberate upon the verdict. . . .

"(10) Where the jury, after having retired to deliberate upon the case, have received other testimony,

or where a juror has conversed with any person in regard to the case. . . . "

The physical facts proved hardly show a separation, but, if they did, the separation was with permission of the court, and the statute only condemns separations without leave of court. The inhibition in subdivision (10) against a juror conversing with any person is "in regard to the case." The conversation the jurors had is clearly shown not to have been in regard to the case. No reference whatever was made to the case. In neither respect was the letter or the spirit of the law violated. In the first place, there was no separation of the jury in fact, and, in the second place, the jurors did not in their conversations over the telephone talk about the case.

We cannot refrain from remarking that our duties have been unnecessarily burdensome, due to the omission of an index to the transcript of the testimony, consisting of 579 pages of typewriting, and containing the testimony of about forty witnesses. Added to this inexcusable omission, counsel for defendant in their briefs did not always cite us to the page of the transcript, for rulings made the basis of assignments. We mention these violations of the court's rules, hoping they may not again occur. It being a capital case, we have proceeded as though the rules had been complied with.

The judgment of the lower court is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.