[Civ. No. 7416. Fourth Dist. May 26, 1964.]

CITY OF CORONADO et al., Plaintiffs and Appellants, v. THE SAN DIEGO UNIFIED PORT DISTRICT et al., Defendants and Respondents.

456

458

John R. Goodbody, City Attorney, Heller, Ehrman, White & McAuliffe, Eugene S. Clifford, M. Laurence Popofsky and John H. Cutler for Plaintiffs and Appellants.

Stanley Mosk, Attorney General, Ariel Hilton, Deputy Attorney General, Aaron W. Reese, McCutchen, Doyle, Brown, Trautman & Enersen, Burnham Enersen, Richard Murray and David Heilbron for Defendants and Respondents.

FINLEY, J. pro tem.*—This is a companion case with 4 Civil No. 7415. The appeal is from a judgment of dismissal entered after general demurrers had been sustained without leave to amend to all five counts of plaintiffs' complaint.

As did Action 4 Civil No. 7415, this action concerns proceedings taken to form the San Diego Unified Port District in which appellant, City of Coronado, was sought to be included and regarding which proceedings were instituted under the provisions of the San Diego Unified Port District Act (Stats. 1962, 1st Ex. Sess., ch. 67; as amended, Stats. 1963, Reg. Sess., ch. 673).

The present action was commenced in the Superior Court of the City and County of San Francisco on December 28, 1962. The complaint filed in San Francisco was in five counts. The first two are based upon alleged technical infirmities in the procedures leading to the formation of the District. The third challenges the validity, as applied to the tidelands administered in trust by the City of Coronado, of sections 14 and 68 of the act, section 14 of which required a conveyance of those tidelands to the district upon its establishment. The fourth and fifth causes of action charge that the voting procedures established by the act, insofar as they relate to Coronado and its taxpayers, are invalid under the equal protection and due process clauses of the United States Constitution for the reason that the voters of Coronado, considered as a unit, were not given a veto power over the formation of the district. Appellants pray for (1) an injunction restraining the district and its commissioners from performing any acts or exercising any powers granted to them under the act excepting only the defense of this action; (2) for a determination of the rights and duties of the City of Coronado under the statutory grant in trust, and a determination of the legality of the procedures employed in establish-

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.

ing the district; (3) that the court declare the tidelands grant in trust to the City of Coronado remains binding and that the state is without power to revoke said trust; and (4) for a declaration that the voting procedures established under the act are, insofar as they relate to plaintiffs, unconstitutional and that they deny appellants equal protection of the laws and due process.

The defendants moved for change of venue to San Diego County and demurred generally and specially. On January 30, 1963, the San Francisco Superior Court determined that the only court having jurisdiction of the action was the San Diego County Superior Court, and transferred the action to that court.

On February 11, 1963, the court sustained defendants' general demurrers to all five causes of action. Plaintiffs declined an opportunity to amend, and the demurrers were therefore sustained without leave to amend. On February 19, 1963, a formal written judgment was entered dismissing the action.

The San Diego Bay Area is divided into a number of separate cities, viz.: San Diego, Chula Vista, Coronado, National City and Imperial Beach. Each of these cities borders upon the Pacific Ocean or San Diego Bay. Prior to 1962, all but Imperial Beach were acting as trustees of state tidelands within or adjacent to their borders which had been granted to them in trust by the State of California.

Thus, prior to 1962, any program for the common development of the bay area port and harbor facilities and adjacent tidelands would have been impossible without the coordinated action of each of the separate municipalities. The California Legislature enacted the San Diego Unified Port District Act in order to solve this problem. In section 2 of the act the Legislature made this declaration and determination: "§ 2. It is hereby declared to be the policy of the State of California to develop the harbors and ports of this State for multiple purpose use for the benefit of the people. A necessity exists within San Diego County for such development. Because of the several separate cities and unincorporated populated areas in the area hereinafter described, only a specially created district can operate effectively in developing the harbors and port facilities. Because of the unique problems presented by this area, and the facts and circumstances relative to the development of harbor and port facilities, the adoption of a special act and the creation of a special district

is required." Accordingly the act provided for the establishment of: "A port district ... for the development, operation, maintenance, control, regulation and management of the Harbor of San Diego upon the tidelands and lands lying under the inland navigable waters of San Diego Bay, and for the promotion of commerce, navigation, fisheries, and recreation thereon. ..." (§ 4.)

The municipalities to be included within the district were San Diego, Chula Vista, Coronado, National City and Imperial Beach (§ 5). Upon its formation the district was to become the successor in interest of each of the constituent cities in its capacity as trustee of tidelands (§ 68) and each city had the duty, upon the establishment of the district, to convey to the district all of its interest in the tidelands previously held by it in trust (§ 14). Certain exceptions, not material for present purposes, were made with respect to the tidelands to be conveyed. (Ch. 67, § 14.)

The San Diego Unified Port District was to be established upon the affirmative vote of the electors within the territories comprising the district (§§ 10-13). The matter was to be placed upon the ballot upon the filing with the Board of Supervisors of San Diego County of petitions or resolutions from each of the constituent cities (§ 6). Petitions or resolutions from each of the cities were filed with the board on or about July 30, 1962.

On September 21, 1962, plaintiff City of Coronado and others, in an effort to prevent the election, filed an action which we shall refer to as Action No. 7415, in the San Diego County Superior Court. Named as defendants were the Registrar of Voters of San Diego County, the supervisors of that county and the State of California, the state being joined pursuant to Public Resources Code, section 6308. The complaint prayed for an injunction restraining the defendants from placing the measure calling for the formation of the district upon the November 6, 1962, ballot and from taking any further steps toward the establishment of the district. A preliminary injunction was denied, and the election proceeded according to schedule. The voting resulted in approval of the formation of the district.

As provided in section 11 of the act, the vote relating to the formation of the District was taken in "two parts," the City of San Diego constituting the first part and the Cities of Chula Vista, Coronado, National City and Imperial Beach collectively constituting the second part. The district could

not be established without the affirmative vote of both parts and thus each part possessed a veto power.

After the outcome of the election had been determined, appellants, City of Coronado and R. J. Townsend, filed a first amended complaint in Action No. 7415 on November 13, 1962, in which they sought to enjoin the formal establishment of the district. The first amended complaint and the other proceedings in Action No. 7415 are also before this court. The facts alleged and the charges made in the first amended complaint in Action No. 7415 are virtually identical with the facts alleged and the charges made in the present complaint.

All defendants demurred to the amended complaint in Action No. 7415. On November 29, 1962, the general demurrers of all defendants were sustained to the first two causes of action and the general demurrers of all defendants, other than the State of California, were sustained to the remaining causes of action. A preliminary injunction restraining the formation of the district was dissolved on December 13, and on December 18 the district was formally established.

Appellants elected not to amend the complaint in Action No. 7415 and on December 20, 1962, and January 3, 1963, respectively, judgments of dismissal were entered in favor of the Registrar of Voters and Supervisors of San Diego County and the State of California. On appeal and motion by respondents to dismiss, these judgments have now been set aside and the amended complaint ordered dismissed. This procedure was suggested by appellants to be followed in the event this court determined that all issues in that action had become moot and decided to grant respondents' motion to dismiss the appeal.

In the first count of their complaint in the present action appellants attack the validity of the formation of the district. Their claim is that the Coronado petition calling for the election to approve the district's establishment although signed by the requisite number of registered voters was not signed by voters of the class required under provisions of the act. The particular provision in question on this point, section 6(a), reads as follows: ''(a) A petition calling for the formation of the district is filed with the board of supervisors from each of the five cities specified in Section 5. *Each of the petitions from the five respective cities shall be signed by at least five per cent (5%) of the voters registered for the last municipal election in each particular city.*''

Appellants maintain that the words ''five per cent (5%)

of the voters registered for the last municipal election''
means 5 per cent of the specific individuals registered for the
last municipal election, and is not subject to the interpreta-
tion ''five per cent (5%) of the *number of* voters so regis-
tered.''

As to this count respondents take the position that quo
warranto is appellants' only available procedure for attack,
that regardless of the validity or invalidity of the petition
the board of supervisors after an opinion by the legislative
counsel and after due consideration determined that the peti-
tion was valid, certified the results of the voting for the
district's establishment and entered its order declaring the
district duly formed and existing and that the officers of the
district had entered upon immediate performance of their
duties. Respondents claim that these acts brought into being
a de facto if not a de jure corporate entity and that appel-
lants impliedly admitted it was either one or the other by
bringing suit against it, for suit cannot be legally brought or
maintained against a nonexistent party. (*Oroville & V. R.R.
Co.* v. *Supervisors of Plumas County,* 37 Cal. 354; *Martin* v.
*Deetz,* 102 Cal. 55 [36 P. 368, 41 Am.St.Rep. 151].) Accord-
ingly, say respondents, even under a strict interpretation,
limiting application of the quo warranto rule, appellants
have no right to challenge the validity of the formation of
the district in an action such as this and that the demurrers
were properly sustained.

Appellants maintain that even though quo warranto be
available it would, as to appellants, be inadequate as a
remedy. They point to the requirements of section 6308 of the
Public Resources Code making the State of California a nec-
essary party to any action or proceeding brought against
any political subdivision or agency of the state involving the
title to or boundaries of tidelands or submerged lands. They
point out that in this action, as in Action No. 7415, the State
of California was, therefore, of legal necessity named a party
and in both actions represented by the Attorney General
whose discretionary leave must be had before commencing
any action in quo warranto. They further point out that the
Attorney General opposed appellants' claims in Action No.
7415 and entered demurrers in that action prior to the time
that quo warranto posed a possible procedural obstacle. They
further contend that because the state through the Attorney
General is an adverse party here, the Attorney General can-
not be required to assume the objective role of ''Representa-

tive of the Public Interest,'' while at the same time adopting the mantle of an adversary in the present controversy. They say were this so the state, through the Attorney General, would be judge of its own cause.

As above stated this appeal is from a judgment entered when demurrers to appellants' five causes of action were sustained without leave to amend. This means that the trial court found that none of the five counts appearing in the complaint could be amended to state a cause of action. Obviously this action could not, by any legal means, be transformed into an action of quo warranto. So even though quo warranto be the only available remedy to test the formation or legal existence of the district this would still not mean that the complaint herein could be amended, so as to thereby institute pursuit of that remedy. The judgment as to the first cause of action must, therefore, be sustained insofar as it is in anywise affected by recourse to quo warranto.

As to the first count appellants also claim, and are not disputed, that although the required percentage of the number of voters registered at the last municipal election signed the petition some 53 of the voters who did sign had not themselves been registered at the last municipal election. They contend, therefore, that the petition was not a valid petition under requirements of the act; that this fact was demonstrated to the board of supervisors by representatives of the City of Coronado, but the board disregarded the infirmity and continued the formation process.

Two sections of chapter 67 pertain to the qualification of voters entitled to sign a petition calling for formation of the district. Section 6(a) quoted above is one. The other is section 8 which provides: ''Each signer of a petition within a particular city shall be a registered voter and resident of that city.''

From a reading of these two sections together it seems plain that section 6(a), is concerned primarily with the number of signatures, while the primary concern of the Legislature in including section 8 within the act was to lay down the *qualifications* of the signators. Were this not true and if section 6(a) be held to embrace and dictate both the number and qualifications of the signators then section 8 would appear to be completely redundant, lending no additional substance whatever to the act. The axiomatic rule of construction is that no language used by the legislative body can be assumed to have been incorporated without meaning or

purpose. ■ A statute will be construed to give effect to all of its provisions. (*In re Goddard* (1937) 24 Cal.App.2d 132 [74 P.2d 818].)

Appellants have pointed out no other California statute, decision or situation in which the specific individual petition signers were required to be registered both at the time of signing and at some prior election. There are other California statutes which provide that petition signers must be registered at the time of signing and that the number of signers is to be equal to a percentage of the number of voters registered or having voted at some prior election. See for instance Streets and Highways Code, section 27043; Health and Safety Code, sections 32003, 32004 and Public Resources Code, section 5781.3, subdivision (b). We have not been shown any cogent reason why the Legislature in this particular instance should have changed the commonly prescribed requirement and substituted the one contended for by appellants. ■ Statutes should be construed so as to harmonize with "the system of which they are a part." (*Welch* v. *Williams*, 96 Cal. 365, 369 [31 P. 222].)

Appellants suggest as a reason for such an innovation that the Legislature wanted the voters of longer residence, registration and acquaintance with the affairs of the area to be the ones to pass upon the wisdom of forming the district. Appellants have not, however, pointed to any evidence or legislative precedent to support such a theory of motivation on the part of the Legislature nor any precedent excepting *Wheeler* v. *Herbert* (1907) 152 Cal. 224 [92 P. 353], upon which this court could base such a conclusion. Many situations and cases have arisen since *Wheeler* v. *Herbert, supra,* was decided in 1907 but appellants have pointed to no more recent incident where the rule announced there has been again applied and upheld. This is, of course, no legal basis for denying legality to the scheme of determination of electors' qualifications sanctioned in that case, but we are not convinced that this ancient rule harmonizes today with our system of election statutes and practices common to this more modern age of accelerated annexations, incorporations, district formations and mobile electors.

■ The justification for requiring voters to be registered is to prevent fraud and not necessarily to bear witness to loyalty or particular concern with the local affairs of any given area. (*Welch* v. *Williams, supra* (1892) 96 Cal. 365 [31 P. 222].) ■ Registration rules should be construed to

permit the greatest number of qualified voters to exercise their rights. (*Ley* v. *Dominguez* (1933) 212 Cal. 587 [299 P. 713].) ▮ It is the policy of the law that an election will not be declared a nullity if upon any reasonable basis such a result can be avoided. (*Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412, 427 [84 P.2d 1034].) "The courts are reluctant to defeat a fair expression of popular will in an election and will not do so unless so required by the plain mandate of the law." (*Veterans' Finance Committee* v. *Betts* (1961) 55 Cal.2d 397, 401 [11 Cal.Rptr. 103, 359 P.2d 471].)

▮ Applying the law as it thus appears to the allegations in appellants' first count we find that the trial court did not err in sustaining respondents' demurrer to the first count of the complaint without leave to amend.

▮ Turning now to the second count we find nothing in chapter 67 which, viewed according to the principles discussed above, would provide a basis for any possible judgment in appellants' favor nor in view of the facts as stated do we see any manner in which the allegations could be amended to state a cause of action. ▮ No provision in the act imposes any mandatory duty upon the supervisors to hold a hearing or hearings prior to the election to determine whether there exists unincorporated territory which would be benefited by inclusion within the area embraced by the district. Under section 15 of the act the discretion given to the board of supervisors is permissive. The act contains no mandate that such discretion must be exercised prior to formation of the district. The language used in section 15 is: "The Board of Supervisors of the County of San Diego *may*, by ordinance, include within the district unincorporated territory which the board has determined would be benefited by the district." (Italics added.) Even though the board had held hearings as appellants insist should have been done, the statute imposes no obligation upon the board to act one way or the other as a result of the hearings.

▮ The demurrers to count two were properly sustained without leave to amend.

▮ The gravamen of the third cause of action is that the State of California is without power to revoke the grant in trust of certain tide and submerged lands to the City of Coronado by means of implementation of chapter 67.

In 1923 the State of California conveyed to the City of Coronado its right, title and interest in certain tide and sub-

merged lands situated within the city's boundaries "to be forever held by said city of Coronado in trust" for purposes of navigation, commerce and fisheries. (Stats. 1923, ch. 49.) By terms of the grant the land was, among other purposes, to be utilized: "[F]or the establishment, improvement and conduct of the harbor and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays, and other utilities. ... necessary or convenient for the promotion of commerce and navigation and fisheries and for the establishment and maintenance of bath houses and bathing facilities necessary or convenient for the inhabitants of said city. ..."

In 1957 an amendment to the original grant expanded the uses to which the land might be employed to include "construction, maintenance and operation of public buildings, public works and playgrounds, and for public recreational purposes. ..."

This legislative act of amending the statute instituting the original grant and trust was apparently not questioned by appellant, City of Coronado, and was at least some indication that the legislative intent in making the grant to Coronado was not to divest the state of control over either the lands conveyed or the purposes of the trust that gives rise to the present question of retention of sovereign control. The Legislature, through enactment of chapter 67, has purported to superimpose upon the above described grant a new trust in favor of the San Diego Unified Port District. The operative section of the statute bearing upon the questioned right of the state to transfer Coronado tidelands to the District provides: "§ 14. Upon the establishment of the district, every city specified in section 5 shall convey to the district all its right, title and interest in and to the tidelands and submerged lands, together with any facilities thereon, which are owned by the city, including any such lands which have been granted in trust to the city by the State in the Bay of San Diego. ... Thereafter the title to such lands shall reside in the district, and the district shall hold such lands in trust for the uses and purposes and upon the conditions which are declared in this act. ..."

Appellants contend that in passing this part of the act the Legislature exceeded its power and that it was without legal authority to revoke the Coronado trust or to provide for transfer to the district of the subject tidelands and superimpose a new trust upon the old, substituting the district for

Coronado, as trustee. Appellants point to the case of *Atwood* v. *Hammond* (1935) 4 Cal.2d 31 [48 P.2d 20], as the paramount declaration of law and policy on this subject by the Supreme Court of California, and maintain that under the rule there announced their third count states a cause of action.

Respondents reply that *Atwood* v. *Hammond, supra,* has to do with tidelands drained and reclaimed as a consequence of harbor development and because this land was no longer required for the purposes of public trust the Legislature had power to free the reclaimed land from the trust. They say further that the language relied upon by appellants is dictum, that apart from this dictum the case stands for the power of the Legislature to revoke a public trust and that the dictum relied upon by appellants was repudiated in *Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 208-210 [282 P. 481]. The language referred to by respondents in the *Long Beach* case is as follows: ''Defendants also contend that the dictum in *Atwood* v. *Hammond,* 4 Cal.2d 31, 44 [48 P.2d 20], that 'the state could not by unilateral action divest the city of its title, nor annex a different use to this eighteen acre parcel [of reclaimed tidelands],' established the rule that although the state can terminate the public trust over such lands, the termination of the trust results, not in a reversion to the state as grantor, but in the ownership by the city of an absolute title to the lands originally conveyed to it in trust. This contention is based on the assumption that, pursuant to a conveyance to it from the state of lands subject to a public trust, the city acquires property or contractual rights that are beyond the power of the Legislature to alter. Even if a conveyance, such as the one to the city of Long Beach in the present case, from the state to a municipal corporation is considered as a contract between the city and the state or as creating property interests in the city, the state acting through the Legislature has the power to alter contractual or property rights acquired by the municipal corporation from the state for governmental purposes. . . . It is clear in the present case that any interest of the city of Long Beach in the tidelands was acquired not as a 'municipal affair,' but subject to a public trust to develop its harbor and navigation facilities for the benefit of the entire state, and was therefore subject to the control of the Legislature. [Citation.]

''Moreover, the construction of the 1951 statute for which defendants contend would result in its unconstitutionality.

If the statutory revocation operates as a transfer of the monies affected thereby to the city of Long Beach, such a transfer would be a gift of public monies in violation of section 31 of article IV of the Constitution.''

Appellants admit, in view of the holding in *Mallon* v. *City of Long Beach, supra,* and the provision of article IV, section 31, of the California Constitution, that neither Coronado nor its inhabitants may claim any *proprietary* interest in the tidelands. They nevertheless argue that Coronado and its citizens are ''favored beneficiaries in administration of the tideland trust'' and that this status restricts the power of the Legislature to deal with the tidelands. They urge that Coronado has relied to its detriment upon the terms of the statutory grant and argue that the State should therefore be estopped to revoke it; that pursuant to the trust Coronado has justifiably and inextricably committed itself to management of the harbor facilities which its taxpayers paid to improve, all in reliance upon deeds from the State of California which recited that title and interest in tidelands within its boundaries were ''to be forever held by said City of Coronado in trust. . . .''

Other points urged by appellants are that private trust doctrines support the irrevocability of the Coronado grant (referring to Civ. Code, § 2280, and amendment) and that the trust is irrevocable so long as the trust purposes for which the grant was made remain unfulfilled.

In passing upon the question of the power of the Legislature to change the trust by implementation of chapter 67 we can be but little concerned with the equitable considerations urged by appellants. The Legislature either had consitutional authority to bring about this change or it did not. If constitutional authority to effect this change reposed in the Legislature all of the equitable considerations urged by appellants would not neutralize this authority and permit the courts of this state to hold the statute void, ineffective or unenforceable on equitable grounds. ■■■ ''All presumptions and intendments favor the validity of the statute and mere doubt does not afford sufficient reason for judicial declaration of invalidity. ■■■ Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears.'' (*Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701]; *State of California* v. *Industrial Acc. Com.,* 48 Cal.2d 365, 371 [31C P.2d 7].) ■■■ ''The existence of facts supporting the leg-

islative judgment is to be presumed and the burden of overcoming the presumption of constitutionality is cast upon the assailant.'' (*Dribin* v. *Superior Court,* 37 Cal.2d 345, 352 [231 P.2d 809, 24 A.L.R.2d 864].) ''In passing upon the constitutionality of any law this court is bound by rigid rules. It is the duty of this court to give force and effect to the questioned statute unless it appears clearly unconstitutional.'' (*Denny* v. *Watson,* 114 Cal.App.2d 491, 495 [250 P.2d 692].) ''[T]he power of the judiciary to declare a statute unconstitutional should never be asserted unless the conflict between the statute and the organic law is palpable and incapable of reconciliation.'' (11 Cal.Jur.2d 381.)

Pursuant to the power of eminent domain the sovereign or its subdivisions or agencies do and of necessity must have the power to take private property for public purposes. Logically then there is no cogent reason why, in order to enhance the public welfare, the state should not be entitled or legally able to alter or extinguish the interest of a political or corporate subdivision in any grant made by the state to it, not in fee simple but in trust for the benefit of the public in general. It cannot be reasonably argued that such grants as that made to Coronado of the tide and submerged lands in question was made primarily for the benefit of the Coronado residents. Appellants say that several statutes and judicial decisions have ''adverted to local needs'' by authorizing uses of tidelands and tidelands' revenues which are beneficial to local municipalities and that these matters constitute an ''implicit . . . acknowledgement'' of the favored position of those municipalities. This argument fails to take into consideration the fact that article IV, section 31, of the California Constitution which forbids the making of a gift of any public money or thing of value, prohibits in such a grant as that of the tidelands to Coronado the creation of any ownership in fee type of interest in the municipality. It also overlooks the fact that the public trust upon which the lands are necessarily held has as its beneficiaries, not the inhabitants of Coronado alone, but the public in general including all of the people of the State of California. (*Mallon* v. *City of Long Beach, supra,* 44 Cal.2d 199 at p. 205.) The cases upon which appellants rely stand merely for the proposition that a tidelands' expenditure which advances navigation, commerce or fisheries will not be struck down by the court simply because

it also results in a benefit to the municipality and its citizens. (*People* v. *City of Long Beach,* 51 Cal.2d 875, 880-81 [338 P.2d 177].)

In support of their contention that the grant in trust to Coronado was irrevocable appellants also place emphasis on the language in the grant providing that the tidelands should be "forever held" by Coronado in trust, and suggest that this language, of its own force, precludes a revocation of the grant. But virtually identical language was used in the 1911 conveyance of tidelands to Long Beach (see *City of Long Beach* v. *Morse* (1947) 31 Cal.2d 254, 256 [188 P.2d 17]), and the Supreme Court nevertheless held in *Mallon* v. *City of Long Beach, supra,* that that grant was subject to revocation at the will of the Legislature.

In seeking to draw an analogy to the rules of private trust law, appellants also contend that a grant such as the present one, made prior to the 1931 amendment of Civil Code, section 2280, is irrevocable unless an express power of revocation has been reserved. But private trust law is not applicable in determining the power of the Legislature to revoke a statutory grant in trust to a corporate or political subdivision. It is true that private trust law is frequently cited by analogy in connection with certain problems arising under such circumstances as in the tidelands' trusts. See, for example, *City of Long Beach* v. *Morse* (1947), *supra,* 31 Cal.2d 254 [188 P.2d 17], which declares, upon the basis of private trust law, that a municipality which is the trustee of a tidelands' trust may not appropriate the income from that trust for its own municipal purposes. But private trust principles cannot be called upon to nullify an act of the Legislature or modify its duty, under the California Constitution (art. XV, § 2), to do all things necessary to the execution and the administration of the public trust. See *Forestier* v. *Johnson* (1912) 164 Cal. 24, 34 [127 P. 156]. Neither can private trust principles be called upon to limit article IV, section 31, of the California Constitution which forbids the creation of any proprietary interest in a municipality in connection with a conveyance of the tidelands.

At any rate, the question was settled in *Mallon* v. *City of Long Beach, supra,* wherein it was held that the 1911 grant in trust to Long Beach, which contained no reservation of a right to revoke, could nevertheless be revoked at the will of the Legislature.

Viewing the subject from a slightly different aspect,

no grant of lands covered by navigable waters can be made which will impair the power of a subsequent Legislature to regulate enjoyment of the public right. (*Mallon* v. *City of Long Beach, supra; People* v. *California Fish Co.* (1913) 166 Cal. 576 [138 P. 79].) ▮▮▮ Upon grant to a municipality subject to a public trust, and accompanied by a delegation of the right to improve the harbor and exercise control over harbor facilities, the lands are not placed entirely beyond the supervision of the state, but it may, and indeed has a duty to, continue to protect the public interests. (*Illinois Central R.R. Co.* v. *Illinois*, 146 U.S. 387, 452-453 [13 S.Ct. 110, 36 L.Ed. 1018, 1042].) In the *Illinois* case appears this language: " 'The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. *In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State.*' (Emphasis ours.) "

To hold that the State of California through its Legislature is without power to change from a small municipal trustee to a port district comprised of five municipalities would be to place San Diego harbor beyond the direction and control of the state for the benefit of the general public. ▮▮▮ Moreover, the state is not only the trustor of the statutory grant of the tidelands to Coronado, possessing as such the power to alter, amend, modify or revoke that trust so that the tidelands subject to the trust may be administered in a manner most suitable to the needs of the people of this state; the state is also the representative of all of the people, and all of the people are the beneficiaries of the basic trust. Therefore, when the state acts in any way to alter or amend a statutory grant in trust made by it, it acts both as trustor and in

behalf of the beneficiaries of the trust. This dual capacity has been described in *People* ex rel. *State Lands Com.* v. *City of Long Beach* (1962) 200 Cal.App.2d 609, 615 [19 Cal.Rptr. 585] as the state being the "settlor-beneficiary" in creating these statutory trusts. ██ It is of course one of the familiar private trust law principles, also similarly applicable to a public trust, that the trustor and the beneficiaries, acting in concert, may alter, amend, or revoke the trust in any manner which is not contrary to law or public policy.

██ The demurrer to appellants' third cause of action was properly sustained without leave to amend.

██ In their fourth cause of action appellants take the position that by classifying Coronado and San Diego voters differently, chapter 67 denied appellants equal protection of the law. They say that inasmuch as San Diego voters are classified as municipal residents that Coronado voters are likewise entitled to be so classified and that the justiciability of this controversy is rendered incontestable by the case of *Baker* v. *Carr* (1962) 369 U.S. 186 [82 S.Ct. 691, 7 L.Ed.2d 663] and its progeny. ██ Appellants say that if San Diego residents had opposed the district's formation by a narrow margin, while voters in the other four constituent cities had decisively approved its creation the San Diego vote would have defeated the proposal even though a majority of the other Bay Area residents favored the District. On the other hand, appellants say, Coronado residents cast their votes as members of an artificially created electorate, consisting of the voters of four cities, which reflected in no way the interests of Coronado citizens as residents of their individual municipality. They say that San Diego voters could shelter their intrinsic municipal interests from the wishes of the electors of the other four cities encompassed in the proposed district while Coronado voters could not and that such classification "is wholly arbitrary and without rational justification."

This position by appellants appears without merit. We do not find any authority cited by appellants which requires that in a matter of general public concern the vote of one city must be given equal effect to the vote of any other without reference to the number of voters casting their ballots within each. ██ Here the formation of the district was given a certain local option aspect but primarily it is a matter of general public interest. As a matter of law the scheme provided in chapter 67 looking to formation of the district

need not have been so oriented. Appellants have offered no valid reason why the Legislature could not have provided a system of voting without any reference whatsoever to residence in the *cities* involved. ██ There is nothing before us to indicate why the Legislature chose the particular scheme embraced in chapter 67, but we cannot agree with appellants that it was in any manner unfair or discriminatory as to them. Indeed had the votes of all of the constitutent cities in the district, including San Diego, been counted as a unit rather than in two divisions, appellant city would clearly have been in a less favored and potent position, for each city's individual votes would have carried exactly the same weight regardless of size and population. There is no constitutional indication that vote clusters rather than individual votes within a state are the primary subject of protection by the organic law.

In *Gray* v. *Sanders* (1963) 372 U.S. 368 [83 S.Ct. 801, 9 L.Ed.2d 821], the court held that the Georgia County Unit System, which gave the votes of less populous counties greater weight than the votes of more populous counties, deprived voters in the more populous counties of equal protection. The court stated: ''The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote.'' And in *Sincock* v. *Duffy* (D.C.Del. 1963) 215 F. Supp. 169, the court held, among other things, that a Delaware statute alloting each Delaware county equal representation in the State Senate deprived voters in the more populous counties of equal protection, notwithstanding the fact that the counties had been represented equally in the Delaware Senate and its precursor for over 200 years. The court said that the basic principle governing apportionment of senators must be that of ''population representation.''

Thus *Baker* v. *Carr, supra,* and ''progeny'' declare in effect that the Fourteenth Amendment requires the boundaries of cities and counties to be disregarded so that equal numbers of persons may be represented and have their votes counted with reasonable equality. To put it another way, in an election, not strictly local option in nature, the Fourteenth Amendment entitles one to have his vote counted with weight equal to that of another, not have his political subdivision's votes count equally to those of another political subdivision, without reference to the number of people residing in either.

"The Equal Protection Clause relates to equality between persons as such rather than between areas." The election here involved was by the Legislature cast in a local option mold only to the extent that the voters in each of the *two areas* delineated in the act could, by a majority vote, have exercised a veto over formation of the District. Appellant, City of Coronado, however, had no constitutional right to which it has pointed to have this power of veto further restricted to the point where Coronado voters alone could veto formation of the district. (*Salsburg* v. *Maryland* (1954) 346 U.S. 545, 551 [74 S.Ct. 280, 98 L.Ed. 281, 288]. Accord, *Missouri* v. *Lewis* (1879) 101 U.S. 22 [25 L.Ed. 989].)

In *Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 603, 611 [9 Cal.Rptr. 431] appears the following language which is particularly appropriate to the situation presented here: "It would therefore clearly appear that when a general law of the state, adopted by the state Legislature, provides for a scheme of public improvement, the scope of which intrudes upon or transcends the boundary of one or several municipalities, together with unincorporated territory, such contemplated improvement ceases to be a municipal affair and comes within the proper domain and regulation of the general laws of the state."

Appellant's argument that the voting scheme did not reflect the "interests of Coronado citizens as residents of their municipality" does not change the rule, because that interest is not and cannot be legally protected excepting in purely local option voting for local objectives recognized and sanctioned as such by the state. Municipalities as a general concept, exist only as convenient conduits through which the state may administer its territory, and accordingly the state may, without violation of the Constitution, create and regulate or deny power to extend or limit the boundaries of municipalities, "consolidate two or more into one, overrule their unchartered legislative action whenever it is deemed unwise, impolitic, or unjust, and even abolish them altogether ... and substitute in their place those which are different." (*Town of Mount Pleasant* v. *Beckwith* (1879) 100 U.S. 514, 529 [25 L.Ed. 699, 702] ; *County of Laramie* v. *County of Albany* (1875) 92 U.S. 307, 312-13 [23 L.Ed. 552, 554-555].) "The regulation of municipalities is a matter peculiarly within the domain of the state. . . . The City cannot invoke the protection of the Fourteenth Amendment against the State." (*City of Newark* v. *State of New*

*Jersey* (1923) 262 U.S. 192, 196 [43 S.Ct. 539, 67 L.Ed. 943, 946] ; *Williams* v. *Eggleston* (1898) 170 U.S. 304 [18 S.Ct. 617, 42 L.Ed. 1047].) Indeed, the Supreme Court has held that "no substantial federal question is presented" under the Fourteenth Amendment by a city's claim against its state. (*City of Trenton* v. *State of New Jersey* (1923) 262 U.S. 182, 192 [43 S.Ct. 534, 67 L.Ed. 937, 943, 29 A.L.R. 1471], cited with approval in *Mallon* v. *City of Long Beach* (1955) *supra,* 44 Cal.2d 199, 209 [282 P.2d 481].)

As to any legislative authority to create classifications for its purposes this language appears in *In re Herrera* (1943) 23 Cal.2d 206, 212 [143 P.2d 345] : "The authority and the duty to ascertain the facts which will justify classified legislation must of necessity rest with the legislature, in the first instance, to whom has been given the power to legislate and not to the courts and the decision of the legislature in that behalf is ordinarily conclusive upon the courts. Every presumption is in favor of the validity of the legislative act. ..." See also *State of California* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 365 [310 P.2d 7] and *Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620 [91 P.2d 577].

"Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it." (*Sacramento Mun. Util. Dist.* v. *Pacific Gas & Elec. Co.* (1942) 20 Cal.2d 684, 693 [128 P.2d 529] ; *State of California* v. *Industrial Acc. Com., supra.*)

It appears therefore that respondents' demurrer to appellants' fourth count was properly sustained without leave to amend.

After incorporating by reference certain paragraphs of their first and fourth counts, appellants set forth their fifth count as follows: "Plaintiffs are informed and believe, and therefore allege, that the San Diego Unified Port District will take over and assume a bonded indebtedness in excess of Fifteen Million Dollars ($15,000,000) incurred for harbor development and improvement by the City of San Diego, which indebtedness will henceforth be an obli-

gation of the plaintiff R. J. TOWNSEND and others "similarly situate in the City of Coronado pursuant to Section 67 of Chapter 67, which provides as follows: 'Sec. 67. The district shall take over and assume the bonded indebtedness incurred for development of tide and submerged lands of the county or any city specified in this act which shall have heretofore issued bonds or created any bonded indebtedness for harbor development or improvement in the Bay of San Diego and to issue any bonds for the retirement of any such outstanding bonded indebtedness. For the purpose of retiring bonds assumed by the district, the revenues, if any, from the facility or facilities constructed through the use of the bond proceeds shall be used to retire such bonds. Proceeds raised through taxation may also be used to retire such bonds.

'The district shall also take over and assume other indebtedness, including indebtedness arising out of contractual obligations, of the county or any city specified in this act which indebtedness shall have been incurred for development of tide and submerged lands.'

"Plaintiffs have been denied the due process of law guaranteed by the Fourteenth Amendment of the United States Constitution in that the City of Coronado has been denied the right as a self-governing municipal entity to vote on whether the City of Coronado should be included within said district, whether the aforesaid bonded indebtedness should become an obligation of the taxpayers of the City of Coronado, and whether said district should be established."

As is pointed out by respondents, it is true that the Coronado tidelands, as a part of the district, will be subject to the debt assumed by or incurred by the district. But since neither appellant has any proprietary interest in those tidelands, rendering them subject to the debts assumed by the district, including San Diego's, deprives appellants of nothing constitutionally protectable.

It will be noted that chapter 67 provides that bond obligations of the district *shall* be retired through use of revenues derived from the facility or facilities constructed through use of the bond proceeds, and the proceeds raised through taxation *may* also be used to retire such bonds.

From this it appears entirely possible that the bonds assumed by the district may be completely retired through revenues derived from the facility or facilities constructed through use of the bond proceeds and that no direct obliga-

tion through taxes for payment of the assumed bonds will ever fall upon appellant Townsend or the other taxpayers of appellant City of Coronado. Unless and until a tax for retirement of said bonds should be levied it would not appear that appellant Townsend is deprived of any property or is saddled with any present obligation with or without due process of law. To be in legal position to question the act appellants' affected interest must be direct .and immediate. (*Drumhiller* v. *Wright* (1923) 64 Cal.App. 498 [222 P. 166].) In the levying of any tax the property of appellant city is of course exempt and it could never suffer property loss through such taxation.

Even assuming the threat of an immediate tax for purposes of retiring the bonds to be sufficiently substantial and imminent to constitute a taking of property, appellants' claim that such taking herein would be without due process of law cannot be supported.

Similar issues were presented in *Hunter* v. *City of Pittsburgh* (1907) 207 U.S. 161 [28 S.Ct. 40, 52 L.Ed. 151]. The following language appears and even though it is characterized by appellants as dictum it would even so, being a pronouncement of the U.S. Supreme Court, be entitled to some persuasive influence: "The State ... at its pleasure ... may ... expand or contract the territorial area [of a municipality], unite the whole or part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State ... may do as it will, unrestrained by any provision of the Constitution of the United States. *Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason ... there is nothing in the Federal Constitution which protects them from these injurious consequences.*" (Pp. 178-179 [52 L.Ed. at p. 159].) (Italics added.) *Hunter* v. *City of Pittsburgh, supra,* is referred to in *Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] as follows: "[*Hunter* v. *City of Pittsburgh* held that] a citizen of one municipality is not deprived of property without due process of law by being subjected to increased tax burdens as a result of the consolidation of his city with another...."

"[I]f one principle clearly emerges from the numerous decisions of this Court dealing with taxation it is that the Due Process Clause affords no immunity against mere inequalities in tax burdens, nor does it afford protection against their increase as an indirect consequence of a State's exercise of its political powers." (Pp. 342-343 [5 L.Ed.2d at p. 114].)

In further derogation of the position taken by appellants in their fifth count in the complaint see also these cases: *Town of Mount Pleasant* v. *Beckwith* (1879) 100 U.S. 514 [25 L.Ed. 699] ; *Morgan* v. *City & Town of Beloit* (1868) 74 U.S. (7 Wall.) 613 [19 L.Ed. 203] ; *County of Laramie* v. *County of Albany* (1875) 92 U.S. 307 [23 L.Ed. 552] ; *Mallon* v. *City of Long Beach, supra,* (1955) 44 Cal.2d 199 [282 P.2d 481].

■ Assessing appellants' claims in the light of their allegations and the authorities discussed we must conclude that the legal rights of appellants have not been invaded by the provisions of chapter 67 nor the questioned proceedings taken thereunder in formation of the San Diego Unified Port District. Appellants do not question that they were duly represented in the Legislature which passed chapter 67 and from all that appears they, as well as all Coronado voters, were by the act accorded proportionate voting strength in the election held to sanction, and which did sanction, formation of the district. The authorities set forth above clearly hold that this court cannot substitute its judgment for that of the Legislature when it set up the two-area voter classification, particularly when this classification gave to the vote of appellant Townsend and all other Coronado electors greater weight than to the individual votes in the San Diego section.

■ We see no particular in which any count in the complaint could be amended to state a cause of action and therefore hold as to all counts that the demurrers were properly sustained without leave to amend.

The judgment is affirmed.

Griffin, P. J., and Coughlin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 22, 1964.